541 So.2d 297 (1989)
Margaret B. SURGI
v.
OTIS ELEVATOR COMPANY and Liberty Mutual Insurance Company, and Elmwood Development Company and the Travelers Insurance Company.
No. 88-CA-809.
Court of Appeal of Louisiana, Fifth Circuit.
March 15, 1989.
Marshall E. Title, New Orleans, for plaintiff/appellant.
C. Edgar Cloutier, Christovich & Kearney, William H. Syll, Jr., Law Offices of James J. Morse, New Orleans, for defendants/appellants.
Before GAUDIN, DUFRESNE and GOTHARD, JJ.
GOTHARD, Judge.
This tort suit is for injuries resulting from an elevator accident.
Margaret Surgi was injured on August 7, 1985, when an elevator suddenly rose several inches as she was stepping into it, causing her to trip and fall forward. Mrs. Surgi was returning from lunch with a group of her co-employees at AT & T, whose offices were located in Jefferson, in a building owned by the Elmwood Development Company. The elevator had been built and installed by Otis Elevator Company, and Elmwood had a contract with Otis to maintain all the elevators in the ten story building.
Mrs. Surgi had several minor injuries which resolved early on but continued to experience lower back pain. On June 27, 1986 she filed suit against Otis and its insurer, Liberty Mutual Insurance Company, *298 and against Elmwood and its insurer, Travelers Insurance Company. The suit set out claims of product liability and negligent maintenance against Otis and Liberty. Surgi alleged strict liability as owner of a building containing a defective elevator and negligence for failure to warn of its problems against Elmwood and Travelers. The defendants answered, denying the allegations, with Elmwood and Travelers filing a cross-claim against Otis and Liberty. Trial before a jury was held May 23-25, 1988. At the end of the plaintiff's case the court dismissed the products liability claim against Otis.
The jury found that Elmwood was liable as owner of a defective elevator but was not negligent. It found no negligence on the part of either Otis or Mrs. Surgi, the plaintiff. The jury made an unitemized award of $26,250 for the plaintiff's injuries. The court adopted the verdict as its judgment, dismissing both the plaintiff's claim and Elmwood's cross-claim against Otis.
Issues
Both Mrs. Surgi and Elmwood appealed and ask this court to review the directed verdict dismissing the product liability claim against Otis and the jury's finding of no negligence on the part of Otis. Mrs. Surgi raises as an issue the adequacy of the damage award.
Facts
The testimony of Roger Roddy, an Otis elevator mechanic and troubleshooter, and of Frederick Nowak, an electrical engineer and long time employee of Otis, establishes that the problem elevator is an "Elevonic 101" and was installed in 1982. The elevator is operated by a complex computer system which regulates the elevator's stopping, starting, speed, and opening and closing its doors. The problem in elevator # 4 at the Elmwood building was described as one of "leveling." The elevator is programmed to stop within one-quarter inch of the floor. When the car has stopped, the brake sets and the doors open. If the car and floor are not level (or change levels with the increase or decrease of the load), the elevator re-levels itself automatically.
On July 19 and July 29, 1985, Roger Roddy had been called to examine and repair the elevator because it was not stopping level with the floor. On both occasions he attached an operator's maintenance terminal (OMT) to the elevator's computer processor board. When he found nothing wrong, he replaced the power amplifier input-output (I/O) board and the transducer I/O board, feeling that they were the most likely source of the problem. On both trips he ran the elevator for some time with no repeat of the problem. He was called again on August 8, the day after the accident, and the OMT showed two problems, a directional failure and leveling control failure. He again changed the I/O boards but testified that he thought the generator field power amplifier unit might have an intermittent malfunction and might need replacing. Nowak theorized that the car had stopped slightly out of level; he attributed the elevator's sudden rise on August 7 to an amplifier malfunction, which cause the amplifier to put out insufficient voltage to produce the counter balancing torque needed to hold the elevator in place when the brake lifted to allow releveling. Fred Liebkemann, the plaintiff's mechanical engineering expert, testified that in his opinion the positioning transducer or the transducer board and the power amplifier board were defective and caused the leveling problems of July 19 and 29 and August 7. He surmised that the boards were bad when installed by Roddy. He had not studied the design of the elevator and made no suggestion that the elevator was not built according to code or was defective when delivered.
Products Liability Claim Against Otis
The court in Hunt v. City Stores, Inc., 387 So.2d 585, 589 (La.1980) set out the standard of proof in a product liability claim, as follows:
...[U]nder Weber [Weber v. Fidelity & Casualty Insurance Co. of N.Y., 250 So.2d 754 (La.1971)], the plaintiff in a products liability suit must only prove that the product was defective, i.e., unreasonably dangerous to normal use; that the product was in normal use at the time the injury occurred; that the product's *299 defect caused his injury; and that the injury might reasonably have been anticipated by the manufacturer. It is unnecessary to prove that the manufacturer was negligent because he knew or should have known of the dangerous condition of the product at the time of the manufacture or sale.
In Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986), the court added the requirement that the plaintiff must prove the dangerous condition of the product existed at the time the product left the manufacturer's control. As the malfunction in the elevator arose after many thousands of runs over a period of three years, in the instant case, it is apparent that the plaintiff did not prove that the elevator itself was defective when delivered.
The plaintiff's expert, Liebkemann, focused on the possibility of defects in the new I/O boards, but had no test results or other data to support a finding that they were flawed. He stated further that problems in the boards could develop because of a short circuit in the system or other electrical problems which burned them out. As the plaintiff failed to show by a preponderance of the evidence that a defect existed in the boards and that defect caused the elevator to malfunction, we find that the court correctly rendered a directed verdict dismissing the product liability claim against Otis.
Negligence and Maintenance Claim Against Otis
The appellants argue that because Otis employees were the only persons repairing the elevator and had done so twice shortly before the accident, it was an abuse of discretion for the court to let stand the jury's finding of no negligence.
Courts of appeal may reverse a finding of fact only when it is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978). As the evidence as to causation was not conclusive, we cannot say that the finder of fact was in error.
Roddy testified in detail as to the procedures he followed when called to the building on July 19 and 29. He tested the elevator thoroughly after replacing the I/O boards and received no reports of failures after either date for several days afterward. He pointed out that one cannot spot an intermittent malfunction in a piece of electronic equipment unless the malfunction takes place when he is present. Mr. Liebkemann, the plaintiff's expert conceded that it is impractical to determine in the field the cause of a malfunction in a solid state controlled mechanism. The repairman isolates the most plausible component, replaces it, and then checks the system by running the elevator several hours. If there is no repeat of the problem he may assume that the problem is corrected. He stated that intermittent faults cannot be predicted by testing. Frederick Nowak testified for Otis that Roddy had taken the proper steps and replaced parts in the proper sequence. Accordingly, as the finding that Otis was not negligent in maintaining the elevator was not clearly wrong, we affirm it.
Damage Award
The jury was asked: "What sum of money will reasonably compensate Margaret Surgi for her injuries?" Mrs. Surgi argues that in making a global award of $26,250 the jury apparently failed to consider medical specials and/or lost wages. She states that under Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), the lowest figure to which the award should be raised would include $50,000 for pain and suffering, $40,678 for lost wages, and $25,014.91 for medical expenses. Elmwood's counsel did not brief the issue of damages; however, Otis contends that the lump sum award should not be disturbed because Mrs. Surgi failed to prove her wage loss, or that the medical expenses were in fact related to the accident, or that her injuries were as severe as claimed.
We find no basis for Otis' attempt to discount Mrs. Surgi's injuries. For several weeks she had pain not only in the lower back but in the foot, leg, and upper back. The incision from a breast operation she had had the week before began bleeding. She was treated by her family physician through December, 1985 when AT & T sent *300 her to Dr. Harold Stokes, an orthopedic surgeon. After having her undergo a CAT scan, Dr. Stokes told her she could work. She began having pain at work in March and in April saw Dr. Wilensky, who had an EMG administered and suggested half-day work. She returned to Dr. Stokes in June, 1986 and had a myelogram but did not resume working as she was in too much pain. She received psychiatric treatment for depression from July, 1986 to August, 1987. In the meantime, from January through March, 1987, at AT & T's request she entered the pain clinic at Touro, returning to work in May, 1987. She began having more severe pain, with pressure down her left leg, and was hospitalized in February for repeat EMG, CAT scan, and myelogram. A consultant orthopedist suggested an epidural spinal steroid injection, which was performed in February, 1988. She became virtually pain free afterward and has worked continually for AT & T since May, 1987 except for the brief 1988 hospitalization.
At no point did Mrs. Surgi allege a herniated disc or that she was a candidate for surgery. Dr. Richard B. Morse, the head of the pain clinic and professor of psychiatry at LSU Medical School, testified that the myelograms were normal, but he felt that she had had a severe strain to her back with nerve root irritation. As part of the treatment at Touro she received nerve blocks, which gave her considerable relief. At no point was she considered to be malingering. Dr. George Murphy, an orthopedic surgeon, felt that while the CAT scan and myelogram were unremarkable, the EMG suggested some irritability of L-5, S-1 nerve root distribution. Dr. Stokes, testifying by deposition, found no objective evidence of a problem other than enlarged facet joints bilaterally at L5-S1 but felt they were of doubtful importance and not consistent with her complaints. He released her in June, 1986 to return to work. Dr. Morse, a psychiatrist and head of the Touro pain clinic, testified that when he first saw Mrs. Surgi for evaluation in January, 1987, she reported having had a depression and having received psychotherapy in 1970 when it was discovered that she had Hodgkins' Disease. She recovered from the cancer and returned to work. When Dr. Morse saw her he felt that she had a moderate to severe depressive reaction but that she probably had been severely depressed earlier on and was improving.
The appellee, Otis, suggests that the jury was entitled to find that the plaintiff had no claim for lost wages or medical expenses which had been paid by others. In the case of medical expenses, this argument has no merit, although AT & T did pay for at least half the medical expenses incurred by Mrs. Surgi. The collateral source rule is explained in Hall v. State, Department of Highways, 213 So.2d 169, 175 (La.App. 3rd Cir.1968), writ refused 252 La. 959, 215 So.2d 128 (La.1968), as follows:
While a tortfeasor is entitled to credit for payments made through insurance procured by the tortfeasor himself, Gunter v. Lord, 242 La. 943, 140 So.2d 11 (1962), the plaintiff's tort recovery is not diminished because of payments made through insurance of other collateral sources independent of the wrongdoer's procuration or contribution, ... [Citations omitted.]
See also Lofton v. Whimper, 425 So.2d 1307 (La.App. 4th Cir.1983). Accordingly, our calculation of medical expenses billed to Mrs. Surgi, not AT & T directly, amounts to $23,979.76. When the medicals are deducted from the jury award of $26,250, only $2,270 remains to cover general damages and lost wages.
Mrs. Surgi testified that she lost about 20 months' work, or $35,000 to $40,000 including overtime. The employer paid her salary except for the period of June 17, 1986 to January 16, 1987. The collateral source rule also applies to wages, in that a tortfeasor is not entitled to credit for payments made as sick leave benefits. Teal v. Allstate Ins. Co., 348 So.2d 83 (La.App. 4th Cir.1977), writ denied 351 So.2d 164 (La. 1977). The plaintiff put on no evidence other than her own rather vague testimony as to the periods she was away from work and the wages she was due and whether the payments made were charged against accumulated leave. For that reason, we *301 may not award her the gross amount of wages sought. However, she stated with certainty that her salary was $473 per week and she was without any compensation at all for the twenty-three weeks AT & T did not pay her, from which we conclude that her out-of-pocket loss of wages was $10,879.
As is well known, an appellate court may not disturb a damage award unless it is a clear abuse of discretion. Where the award is found to be inadequate, the court of appeal may raise it only to the lowest point that is reasonable for a similar injury. Coco v. Winston Industries Inc., supra.
We find that an award that allows only $2,270 for pain and suffering and lost wages is a clear abuse of discretion. Accordingly, we award the plaintiff $5,000, the lowest amount reasonable for pain and suffering of two and one-half years' duration, where awards for similar injuries have ranged from $5,000 to $40,000. In addition, she is entitled to special damages of $10,879 for lost wages and $23,980 for medical expenses, for a total award of $39,859.
For the reasons assigned above, we revise the judgment appealed from to raise the damage award to $39,859. In all other respects the judgment appealed from is affirmed.
REVISED AND AS REVISED AFFIRMED.